**TCW SPECIAL CREDITS, INC., Plaintiff**

**v.**

**F/V KASSANDRA Z, OFFICIAL NO. 6553390,**
**Her Engines, Nets, Furniture, Etc., Defendant in Rem**

**and**

**KASSANDRA Z FISHING CO., Defendant in Personam**

---

**AND RELATED CLAIMS-IN-INTERVENTION.**

High Court of American Samoa
Trial Division

CA No. 92-96

October 20, 1999

Before KRUSE, Chief Justice, TUA`OLO, Chief Associate Judge, ATIULAGI, Associate Judge.

Counsel: For Plaintiff TCW, Craig Miller and Barry I. Rose
For Plaintiffs-in-Intervention Michael Datin, et al., William Banning and William H. Reardon

## OPINION AND ORDER

This much-prolonged litigation commenced on July 2, 1996, with the filing of plaintiff TCW Special Credits' ("TCW") complaint *in rem* and *in personam* for foreclosure of preferred marine mortgages, arising out of TCW's term loan note from the Kassandra Z Fishing Co., Inc. ("KZFC"), secured by a preferred ship mortgage on the F/V Kassandra Z ("Kassandra Z"), a vessel owned by KZFC. Plaintiffs-in-Intervention Michael Datin, et al. ("the Crew"), members of the crew of the Kassandra Z allegedly owed unpaid wages and other miscellaneous amounts for several past fishing trips, filed a complaint-in-intervention on August 16, 1996 and an amended complaint-in-intervention on October 25, 1996.

Cross-motions for partial summary judgment were filed by the Crew and TCW on August 14, 1997 and February 25, 1998, respectively, and our order denying in part and granting in part the motions for partial summary judgment was issued on July 23, 1998. As will be discussed further below, in that order we outlined, *inter alia,* our interpretation of

the "highest rate of wages" language of 46 U.S.C. § 11107.

In the months that followed our order on partial summary judgment, both the Crew and TCW filed several motions relative to the discovery process. In addition, on January 21, 1999, TCW filed a second motion for partial summary judgment as to amounts owed the Crew for certain of the fishing trips at issue. That motion was denied in our order of May 7, 1999, which also addressed many of the other pending motions regarding ongoing discovery disputes.

The trial of this matter was held June 2-4, 1999, with all counsel present. Closing arguments were timely submitted in writing, the last of which was filed on August 31, 1999.

## Facts

Although specific facts relevant to any given legal issue will be discussed throughout the opinion, the basic facts surrounding the operations and arrest of the Kassandra Z are set forth below.

Built in 1982, the Kassandra Z is a steel-hulled tuna purse seiner registered at 1651 gross tons. It was a United States flagged fishing vessel, owned by a Northern Mariana corporation (KZFC), and it operated in the western Pacific Ocean, using ports in Hawaii, Guam, and American Samoa, with an official home in Honolulu, Hawaii.

Like its counterparts throughout the western Pacific tuna fishing industry, the Kassandra Z sailed on individual, consecutively-numbered trips, each of which involved proceeding from port to the prospective fishing grounds, spending several weeks or even months fishing at sea, and then returning to port and off-loading the catch to a cannery. Crews technically were hired for individual trips, but the majority of the officers and crew were rehired from trip to trip. The crew lists therefore remain relatively consistent throughout the time period relevant to this case.

On April 27, 1996, the Kassandra Z docked in American Samoa, at the conclusion of trip number 26. Pursuant to TCW's complaint for foreclosure of its preferred ship mortgage, the Marshal for the High Court arrested the vessel on July 2, 1996. The crew members were forced off the ship; most were eventually given tickets to return home, which for most of the Crew was Croatia. The vessel was sold at auction on October 18, 1996, for $6 million, and the proceeds from the sale remain in the court registry.

## Discussion

### A. Relevant Federal Statutes

■ The astounding volume of paper filed in this case notwithstanding, the legal issues involved are not terribly complex. The parties agree that the members of the Crew were never given written fishing agreements in violation of 46 U.S.C. § 10601, which reads:

(a) Before proceeding on a voyage, the master or individual in charge of a fishing vessel, fish processing vessel, or fish tender vessel shall make a fishing agreement in writing with each seaman employed on board if the vessel is—
 (1) at least 20 gross tons as measured under section 14502 of this title, or an alternate tonnage measured under section 14302 of this title as prescribed by the Secretary under section 14104 of this title; and
 (2) on a voyage from a port in the United States.
(b) The agreement shall be signed also by the owner of the vessel.
(c) The agreement shall—
 (1) state the period of effectiveness of the agreement;
 (2) include the terms of any wage, share, or other compensation arrangement peculiar to the fishery in which the vessel will be engaged during the period of the agreement; and
 (3) include other agreed terms.

■ In addition, TCW concedes that the terms of 46 U.S.C. § 11107 therefore establish the Crew's proper remedy:

An engagement of a seaman contrary to a law of the United States is void. A seaman so engaged may leave the service of the vessel at any time and is entitled to recover the highest rate of wages at the port from which the seaman was engaged or the amount agreed to be given the seaman at the time of engagement, whichever is higher.

*See also TCW Special Credits v. Chloe Z Fishing Co., Inc.,* 129 F.3d 1330, 1333 (9th Cir. 1997); *Seattle-First Nat'l Bank v. Conaway,* 98 F.3d 1195, 1198 (9th Cir. 1996); *Bjornsson v. U.S. Dominator, Inc.,* 863 P.2d 235, 238-40 (Alaska 1993).

Among others and as discussed below, the issues in dispute relate to specific determinations of which trips should be eligible for § 11107 consideration, which rate of "highest wages" should be used for these purposes, and how the Crew's agreed wages were to be calculated.

## B. Trips 16-24

As a preliminary matter, we must distinguish certain of the trips made by the Kassandra Z. The Crew is owed at least some amount of unpaid wages for 11 different trips actually completed, namely trips 16-26,[1] but the circumstances of the first nine of these trips are vastly different from those of the latter two.

The evidence at trial established that it was the practice of KZFC—and, apparently, throughout the western Pacific tuna fishing industry—to pay wages to its crews in two separate installments. The first was a substantial payment of 90-95% of wages owed, based on the gross amount of fish off-loaded; the second payment, known as a "short check," would cover any remainder owed after the cannery had an opportunity to determine the quality of the fish and the percentage of "rejects" (i.e., fish which are too small or high in salt content to be fit for consumption). Short checks would typically be issued within a few weeks of off-loading, shortly after the cannery issued its "Final Settlement" detailing the volume of fish accepted and the price paid to the owners. *See, e.g.,* Tr. at 37-38 (testimony of Gojko Milisic), Tr. at 2 34-37 (testimony of George John Copitas).

For trips 25 and 26, the Crew received no wages whatsoever, and those trips are clearly subject to § 11107 analysis. For trips 16-24, however, the Crew was paid—*and accepted*—the initial large check, and is due only the amounts of the short checks which were never actually tendered, despite repeated assurances from KZFC that they would soon be forthcoming. Under these circumstances, we do not find it appropriate or necessary to go back and retroactively void these substantially-completed contracts.

Although the "Seaman Protection and Relief Act" (of which § 11107 is part) by its very terms seeks to safeguard the wellbeing of seamen like those of the Kassandra Z, we do not believe that it envisions a situation in which crewmembers tacitly acknowledge the terms of their contract by accepting a full 90-95% of their wages, and then turn around and request that those same contracts be declared void in favor of a higher rate of pay. Rather, we believe that the statute primarily contemplates one of two common scenarios: a seaman either is not paid at all (as in trips 25 and 26 herein), or is offered payment at a wage lower than that which he was promised. In the latter case, we believe that the seaman may either accept the wage offered or bring a claim under § 11107; he

---

[1] The Crew also makes a claim for what they term "trip number 27," related to the time which the Crew spent in port awaiting clearance to sail on their next fishing trip. This issue will be addressed separately below.

cannot, however, accept the payment and then, several years later, seek to retroactively void the contract and claim significantly higher statutory wages.[2]

## C. "Comparable Seaman"

■ Although § 11107 states broadly that a seaman is entitled to receive the higher of agreed wages or the "highest rate of wages at the port from which the seaman was engaged," we held in our July 23, 1998, ruling on partial summary judgment that this provision is properly construed as entitling the wronged seaman not to the highest rate paid *any* seaman, but rather only to the highest rate of wages of a *comparable* seaman. Partial Summary Judgment Order, at 9. This ruling was consistent with the Ninth Circuit's ruling in *TCW Special Credits v. Chloe 3, Inc.*, which held that such a seaman should be awarded the "highest rate of wages that could be earned by a seaman at the port of hire *who has the same rating* as the complainant." 129 F.3d 1330, 1333 (emphasis in original).

When we last reviewed this issue on summary judgment, we were faced with a very specific issue, identical to that which the Ninth Circuit explored in the *Chloe* 3 case: whether § 11107 entitled the lowliest deckhand, who had agreed wages of approximately $5.00/ton, to be compensated at the captain's rate of approximately $40.00/ton — an 800% increase. We found that it did not. Now, we confront the related but distinct question, "how comparable is comparable?"

In our prior order, we held that "a comparable seaman includes the elements of rank, job classification, duties, ability, and other similar factors." Order of July 23, 1998, at 9. There appears to be little debate that for most established positions aboard a tuna boat (captain, engineers, helicopter pilot, deck boss, cook, etc.), these factors will, by definition, all be "comparable" from boat to boat and from fleet to fleet. With respect to the remainder of the Crew, however, who are all officially classified as "deckhands" or "seamen",[3] the parties differ sharply in their interpretations of comparability.

At trial, the Crew sought to establish that these men all form a common

---

[2] We further note that, when administered correctly and fairly, the short check system worked primarily to the benefit of the Crew, allowing them to receive the vast majority of their wages almost immediately upon return to port. The alternative, which the owners could as easily have practiced, would have been to wait until the Final Settlement statements were released to make any payment at all.

[3] These two terms are used interchangeably to refer to all crewmembers below the rank of deck boss, who generally perform a multitude of tasks aboard the vessel.

pool of labor, and that they all perform roughly the same duties on an as-needed basis: they help keep watch for fish, stack the nets, sort and load the fish, assist the engineers, clean the boat, participate in general maintenance, and perform any number of other tasks that may be requested of them by the senior officers. In short, in the Crew's version of life on a tuna boat, all deckhands are roughly interchangeable and are therefore "comparable" for purposes of calculating § 11107 statutory wages.

TCW, on the other hand, highlights the different skills and the spectrum of ability and experience that characterize the crewmembers within this broad ranking. In accordance with its theory that each crewmember is unique, TCW implies that there are distinct positions within the ranks of the deckhands, such as "fish spotter," "net stacker" or "assistant skiff boat driver." Because one deckhand may have been paid only $5.00/ton while another might receive fully double that amount, TCW quite logically concludes that these gradations of pay must relate to factors such as ability and experience, and that "comparability" within this subset of the Crew must therefore take these factors into consideration.

The truth, no doubt, lies somewhere between these two extreme positions. There are indeed significant distinctions in the rate of wages offered deckhands, not only from one ship to another, but even on a single trip of a single vessel. Certainly the reasons for these differences were based at least in part on issues such as ability and seniority, as Fish Captain Gojko Milisic testified. Tr. at 124-26. Similarly, crewmember Goran Uzelac testified that better pay went to those deckhands who routinely performed specialized tasks, such as spotting fish from the mast or operating the winch or driving the skiff boat. Tr. at 313.

At the same time, the facts established at trial also demonstrate that most deckhands performed substantially the same day-to-day tasks, including stacking nets and cork, standing watch, sorting fish, painting, and other such duties not requiring any particular expertise or training. Tr. at 72-73. Even when a deckhand did perform one of the more specialized tasks, such as driving the work boat, upon completion of that single task he would return to those more general duties shared in common by all seamen. Tr. at 155.

The method of hiring replacement deckhands is particularly illustrative of the interchangeable nature of these workers. As Fish Captain Gojko Milisic testified, when a deckhand was not rehired for any reason, the practice was simply that the "[n]ext seaman just takes the job." Tr. at 73. Milisic would simply put in a call to have someone flown out from Croatia, or would hire any available seaman off the docks, regardless of whether the deckhand to be replaced happened to have served in a specialized role such as spotting fish or driving the skiff. *Id.* He typically

170

did not even conduct interviews or other screening processes because, in his words, the deckhands were "[j]ust . . . laborer[s]" and needed "no license, no skill." Tr. at 74, 128-29. Presumably, one of the remaining deckhands was then shifted into that specialized role, with little or no interruption in the vessel's fishing activities.

If deckhands were largely interchangeable but were nevertheless paid vastly different wages, there must be some factor or factors to account for those gradations in pay. While we find that experience and abilities may have played a small role in this process, as discussed above, the evidence indicates that the more critical contributing factors were significantly less tangible. For example, Fish Captain Milisic testified that, among other things, he might pay one seaman more than another because "I like the guy" or because he's not a "trouble maker." Tr. at 124. Another deckhand aboard Kassandra Z was paid several dollars a ton more than others simply because he was the Fish Captain's cousin, and Nilisic testified that this practice was not unusual. Tr. at 125-26. Even those factors which one might presume to be easily quantifiable, such as experience, turn out to be more complicated. Total experience as a seaman might be marginally relevant to wages, but loyalty *to a particular captain* appears to be much more significant. *See, e.g.*, Tr. at 124-26.

Given these factual circumstances, we are left to determine exactly what a seaman must prove in terms of "comparability" in order to make out a successful § 11107 claim. Must he find another seaman, engaged from the same port, who had "good eyes for spotting fish" (however *that* may be defined), had been with his captain for eight years, and generally was not a "trouble maker"? Must his fellow deckhand track down another seaman who, like him, happened to assist the skiff boat driver—in addition to his multiplicity of other more mundane duties—and was also the son-in-law of the fish captain's boyhood friend from Croatia?

We think that to place this kind of burden on a seaman would twist the meaning and intent of § 11107, making it impossible for that statute to serve its fundamental purpose, namely, providing a quick and efficient means by which wronged seamen can get the wages owed to them. As the Crew points out in its closing trial brief, seamen traditionally enjoy wards of admiralty status, and the burdens of proof and production allocated to them under various admiralty claims are, accordingly, relatively minimal. *See, e.g., Comeaux v. T. L. James & Co., Inc.,* 702 F.2d 1023, 1024 (5th Cir. 1983) (seaman's burden of proving cause in Jones Act cases is "featherweight"); *Yelverston v. Mobile Laboratories, Inc.,* 782 F.2d 555, 558 (5th Cir. 1986) (light burden of production in non—statutory maintenance and cure claim); *Neathery v. M/V Overseas,* 700 F.2d 140 (4th Cir. 1983) (upon establishing statutory conditions, burden shifts to shipowner in 46 U.S.C. § 594 claims). We agree that a

similarly light burden of proof is properly applied in § 11107 cases, particularly given the nebulous factors which may often comprise a comparability inquiry, as addressed above.

■ Moreover, there are practical constraints to be considered. Not surprisingly, seamen spend the vast majority of their time *at sea;* to require a seaman to not only locate his or her "perfect match"—if indeed such a match exists—but also to contact that individual and procure testimony, would essentially render § 11107 useless to the average deckhand. As such, we find that although all deckhands are not *per se* comparable, the Crew need only make a *prima facie* showing of comparability in order to make out a § 11107 claim. TCW is then free to rebut by putting forward an alternative seaman who it believes to be more comparable to the claimant. Unlike crewmembers, shipowners have far greater access to crew lists and other such information, and requiring them to find a more comparable seaman than that proffered by a claimant is reasonable and consistent with the goals of the statute.

The Crew offers three alternative wage measures for purposes of determining the highest wages paid to comparable seamen. Those are the highest rates paid: 1) throughout the western Pacific (including the Gemini fleet); 2) throughout the Zuanich fleet, including the Kassandra Z herself; or 3) the Kassandra Z alone. Although John Copitas did offer extensive testimony regarding the policies and procedures of the Gemini fleet, we are not satisfied that even general comparability has been established with regard to that fleet. Unlike the informal procedures which characterized the hiring of crews on the Zuanich boats, for example, Mr. Copitas testified that all hiring and firing on Gemini fleet ships was coordinated by corporate headquarters located in San Diego, rather than by individual ship captains. Tr. at 222. Moreover, he was completely unable to explain why certain deckhands were paid significantly more than others: "That was up to the office. I had nothing to do with it." *Id.* at 243. Without additional information about compensation and how crews on the Gemini boats actually functioned on a day-to-day basis, we decline to find those crews comparable to that of the Kassandra Z.

■ The Zuanich fleet, however, is another matter.[4] The record contains ample testimony to establish that the other vessels within this fleet functioned in essentially the same manner as the Kassandra Z. All vessels in the fleet maintained close contact with each other and functioned as a "Code Group," regularly advising each other of their

---

[4] The Zuanich fleet consisted of up to twelve purse seiners, all of which were managed by Lawrence Zuanich and certain members of his family (most notably, two individuals commonly identified as "Brother John" and "Cousin John").

positions and providing assistance as needed. Tr. at 75. Crewmembers often fished on several of the Zuanich vessels, and their duties were substantially similar on each. *Id.* at 77-78, 320-21. Also, the authority of the fish captain—presumably including the power to hire and fire crewmembers—was consistent throughout the fleet. *Id.* at 76-77.

Under these facts, the Crew has established general comparability and has met its light *prima .facie* burden; because TCW failed to rebut by offering the court more comparable alternatives, we find that each member of the Crew is comparable to his counterparts throughout the Zuanich fleet, within the meaning of the Ninth Circuit's decision in *Chloe Z* and this court's earlier order on partial summary judgment. The exact measure of damages is discussed below.

### D. Master and Fish Captain

TCW argues that neither the master nor the fish captain should be permitted to recover statutory wages under § 11107, on the ground that they were the individuals aboard the Kassandra Z responsible for compliance with federal statutory law, including the § 10601 requirement that written fishing agreements be provided to all crewmembers.

In the *Chloe 3* case, Judge Unpingco of the U.S. District Court for Guam ruled on this exact issue, noting that "a master may not seek penalty wages under 46 U.S.C. § 11107 because failure to follow 46 U.S.C. § 10601 is caused primarily by his own failure to provide written agreement. . . . [H]e shall not avail himself of the protection of the statute he was responsible for adherence." *TCW Special Credits v. Chloe 3,* Order of June 19, 1998, at 6-7. Judge Unpingco noted the master's explicit acknowledgment that he was responsible for § 10601 compliance and, accordingly, barred his claim; he did, however, allow the fish captain to make a claim for statutory wages.

■ By its very terms, § 10601 holds a ship's master accountable for securing written fishing agreements: "[b]efore proceeding on a voyage, the master or individual in charge of a fishing vessel . . . shall make an [sic] fishing agreement in writing with each seaman employed on board." Even absent evidence that Master Raymond Falante exercised actual responsibility for such matters about the Kassandra Z, we believe that just as he enjoys the benefits of his status as master, he must also bear the responsibilities of such position. Having failed to ensure compliance with federal statute, he cannot now benefit from that failure by seeking higher penalty wages.

Unlike the Chloe Z, on the Kassandra Z the fish captain also held an official masters license from the United States Coast Guard. In his

interrogatory responses, Fish Captain Gojko Milisic stated that he "performed all duties required by any Master and Fish Captain," and his trial testimony confirms that he had broad authority to select and hire his crews. Response to TCW Written Discovery, 1.9(c), dated October 25, 1998; Tr. at 25-26, 40. Given those acknowledged responsibilities and his official status as a master, we agree that Fish Captain Milisic, even while serving in a capacity other than master, should similarly be barred from pursuing a claim under § 11107.

Both Falante and Milisic therefore will be entitled only to their agreed wages, as set forth more particularly below.

E. The "Tonnage" Calculation

As discussed generally above, seamen are typically paid a particular fixed wage multiplied by the amount of fish caught, as measured in tons. Accordingly, the method of calculating "tonnage" directly and significantly impacts a seaman's overall compensation, and is therefore an important component of any wage analysis. The Crew argues that, for purposes of determining both agreed wages and § 11107 statutory wages, the proper calculation should be based on gross tonnage, less rejects; TCW maintains that tonnage in both cases should be "adjusted," with certain percentage reductions for less profitable sizes and species, less rejects.

1. Agreed Wages

The tonnage calculation with respect to agreed wages involves a straightforward inquiry regarding the understanding between the Crew and KZFC management. It is undisputed that the Zuanich companies in fact almost always used adjusted tonnages in calculating wages during the relevant time period. However, the Crew maintains that Fish Captain Gojko Milisic always understood tonnage to mean gross tonnage, and that gross tonnage must therefore be the basis of those agreements because he was the individual responsible for making the oral wage agreements with the Crew.

We find that this scenario stretches the bounds of credibility, particularly with respect to Captain Milisic's purported lack of knowledge about tonnage adjustments. As TCW points out, Milisic's own sworn declaration of April 8, 1997, submitted in support of the Crew's motion for summary judgment, clearly contradicts his trial testimony. In his declaration, Milisic stated his understanding of how tonnage was calculated:

> In addition, the owners of F/V Kassandra Z adjusted the tonnage according to the size of the fish delivered. Sometimes

we would be paid 100% for all fish above a certain weight, 90% (or 80%) for medium size fish and nothing for small fish under three pounds.

Tr. Ex. 15, ¶ 8. In its reply brief, the Crew argues that this statement reveals only Milisic's knowledge *at the time the declaration was signed,* rather than his understanding during the trips themselves. Further passages from the declaration, however, belie that assertion. In the same paragraph, Milisic goes on to state:

This "sliding scale" was changed by the owners regularly depending upon the prices paid for the fish by the canneries. We *would never know the exact net adjusted tonnage the company would use in calculating our wages until long after the trip ended.*

*Id.* (Emphasis added.) This statement clearly implies that, while the Crew would not know in advance the precise adjustments for any given trip, they were aware that adjustments would be made based on the cannery receipts. Further, in the next paragraph, Milisic outlines exactly what his agreed wage was to be: "On Trip No. 25, I was to be paid $41.63 per net *adjusted ton* for the first portion of the trip and $41 for the second." *Id.* at ¶ 9. (Emphasis added.) There is no confusing the time frame of these statements.

In addition, even though Milisic at trial generally asserted his lack of prior knowledge about adjustments, he did make several statements to the contrary, confessing that he understood tonnage calculations to be linked to cannery prices, and that he was aware of occasional percentage reductions for medium-sized fish. Tr. at 135, 101. Moreover, common sense suggests that the company's adjustment practices, which were standard over the entire relevant period,[5] must have been known to the Crew. Milisic testified that he frequently discussed compensation matters both with Lawrence Zuanich and with the other fish captains throughout the Zuanich fleet, with whom he was in constant communication. Tr. at 93. He could also estimate with considerable accuracy (often within 1%) the total tonnage of fish taken aboard the Kassandra Z on any given voyage; knowing his promised wage per ton and the amount he actually received for each trip, it is inconceivable that Milisic could not have been aware of the tonnage reductions. Tr. at 93-94.

In addition, the evidence presented at trial indicates that the master of the vessel, Raymond Falante, received at least some documents including

---

[5] Thomas Meneghini, who served as General Manager of the Zuanich operations, testified that adjustments were made at least as far back as 1993, the date of the earliest records which he had reviewed. Tr. at 401.

information about tonnage adjustments. Although he couldn't recall specific interactions with Mr. Falante or Fish Captain Milisic, Thomas Meneghini testified that it was his practice to forward all payroll calculations—including tonnage adjustments—to each ship's master, so that any questions or discrepancies regarding compensation could be addressed. Tr. at 397-98. One document, which appears to be a facsimile entitled "Tonnage for Kassandra Z Trip 23 Payroll—Preliminary Settlement," clearly includes a "% Payable" column indicating tonnage adjustments. Tr. Ex. 53. As indicated on the accompanying covermemo and by a handwritten note on the fax itself, this document was apparently transmitted to Raymond Falanteon or about May 14, 1996.

This document, together with Mr. Meneghini's testimony, demonstrates by a preponderance of the evidence that Master 'Raymond Falante was aware of the Zuanich adjustment practices, and that the remainder of the Crew was similarly informed.[6] Agreed wages are to be calculated based on adjusted tonnages.

2. Statutory Wages

We also find that the "highest wage" comparison required under § 11107 should be calculated according to adjusted tonnages. As discussed above, we lack sufficient information to make comparisons with the Gemini Fleet.[7] The Crew did present some evidence suggesting that gross tonnage payments were made on occasion within the Zuanich fleet, as in the case of the *Chloe* 3's trip number 23B. *See* Tr. at 414-15 (testimony of Thomas Meneghini); Tr. Ex. 55. However, we are not prepared to hold that such an isolated incident within the fleet may serve as the basis for determining the highest wages within the meaning of § 11107.

The record clearly indicates that adjusted tonnages were the standard measures used within the Zuanich fleet. Moreover, the Ninth Circuit expressed the same opinion in the *Chloe 3* case:

---

[6] Given any worker's natural interest in compensation issues and, in particular, the close quarters of the working environment aboard a fishing vessel such as the Kassandra Z, the knowledge of the fish captain and the master are sufficient to convince us that the rest of' the crewmembers understood their wages to be based upon an adjusted tonnage calculation.

[7] Even if we were to consider the Gemini fleet for purposes of establishing the "comparable seaman," however, it would be unfair to apply the wage/ton of one ship and the tonnage calculation system of another. TCW argues, quite rightly, that one company may choose to pay its seamen based on gross tonnage, but could then reduce the wage per ton accordingly to result in the same — or even reduced — net wage.

The rate is then multiplied by the adjusted tonnage of fish caught. [fn. 3] "Adjusted tonnage" is gross tonnage of fish caught and off loaded, adjusted for species and size, less cannery rejects.

129 F.3d 1330, 1331 and fn. 3. As we interpret the language of § 11107, "wage" can only mean that amount paid as standard compensation to a comparable seaman, i.e., his regular rate of pay. If gross tonnages were used on a single trip of a single vessel, such payments for that trip should more properly be construed as a bonus of sorts, rather than the standard "wage" earned by those seamen. Viewed in another light, the rare payment to seamen based on gross tonnage could be seen as one of the many variations in the spectrum of "adjustments" that were unpredictable and varied from trip to trip. Generally, adjustments were at least loosely based on the prices paid by the cannery; perhaps the cannery had extremely high demand during that period and the company chose to reward its employees accordingly? At any rate, we find that percentage adjustments based on size and species were standard within the Zuanich fleet, and any § 11107 statutory wages to be awarded must be calculated on that basis.

3. "Rejects"

The final dispute regarding tonnage concerns the issue of "rejects," generally defined as "fish people cannot eat," which were understood to be excluded from wage calculations. Tr. at 27. The Crew understood that fish under three pounds are more likely to be unfit for human consumption due to their high salt content and the greater likelihood that they could be smashed in the ship's storage wells. They also understood that, as a result, those fish fell squarely within the category of "rejects" for which they would not be paid.[8] Tr. at 36-37, 96-97, 166, 177, 180, 184, 204, 211, 292, 308-10, 319, 336.

The Crew, however, contends that rejects should not include fish under 3 lbs., on the ground that KZFC was in fact paid for such fish on occasion. Unfortunately, the fact that KZFC may have been paid for these fish does not alter the basic agreement between the company and the Crew. Although a more fair system may have mandated payment to the Crew

_____

[8] There exists a minor disagreement regarding whether the common definition of rejects included fish "3 lbs. and under" or fish only "under 3 lbs." Based on these and other transcript passages cited herein, we find that the weight of the testimony supports the latter conclusion. Fish weighing exactly 3 lbs. were understood generally by the Crew to be included in their wage calculations, while only those under 3 lbs. were known to be excluded.

for all fish actually sold to the cannery, there are legitimate reasons why KZFC may have chosen to not pay for sub-3 lb. fish. Knowing that these fish were generally far less valuable, it is reasonable to assume that the company utilized such a system to provide an incentive for the Crew to load only larger fish. Or, it may have been administratively more efficient to pay a premium for the more profitable fish and then to pay nothing for the less lucrative smaller fish. Whatever the reason, the evidence at trial overwhelmingly confirms the understanding between the company and the Crew that fish weighing less than 3 lbs. would not be included in the tonnage calculations; we refuse to upset that understanding by retroactively compensating the Crew for fish which they knew to be likely rejects and for which they never expected to be paid.

The analysis with respect to § 11107 statutory wages yields the same result. Although there may have been a single trip for which KZFC did pay for these smaller fish, as Fish Captain Milisic testified, this was not part of the regular wage of any identified "comparable seaman." Tr. at 134. We find that nonpayment for fish under 3 lbs. was indeed the fleet and industry standard, and therefore decline to include these fish in the adjusted tonnages for purposes of computing § 11107 "highest wages." Tr. at 96-97 (testimony of Gojko Milisic).

F. Port of Engagement

As noted *supra*, § 11107 restricts recovery to the highest rate of wages "at the port from which the seaman was engaged." TCW argues that because each and every member of the Crew did not offer testimony regarding his port of engagement — as well as that of the proffered "comparable seaman" — their claims must necessarily fail.

We agree that there is a technical difference between port of embarkment and port of engagement, as the caselaw cited by TCW indicates. *Henry v. S/S Bermuda Star*, 863 F.2d 1225, 1237 n.54, 1238 (5th Cir. 1989); *Ladzinski v. Sperling Steamship and Trading Corp.*, 300 F.Supp. 947, 949-950 n.3 (S.D.N.Y. 1969). Those two cases, however, merely establish the port to which a sailor is entitled to be returned upon completion or termination of a contract; neither addresses the issue in the unique context of a § 11107 claim.

■ In our view, the "highest wage" provision of § 11107, quite simply, seeks to award a wronged seaman the highest wage paid to a comparable seaman from within the same local community of seamen. It is likely that several members of the Crew may have been technically "engaged" in their home country of Croatia, as Fish Captain Milisic testified that he would frequently call his father to hire replacement seamen out of a large pool of available European labor. Tr. at 73. Certainly § 11107 does not

require that such a seaman, having been promised wages consistent with those of the western Pacific tuna fishing industry where he was actually working, recover only those of the highest paid comparable seaman *engaged in Croatia.*

More importantly, the evidence at trial demonstrated that seamen were hired on a trip-to-trip basis. Tr. at 41. Although there may be an exception for certain other boats of the Zuanich fleet, each trip of the Kassandra Z and the other Zuanich boats on which Fish Captain Milisic sailed—including the Bonnie and the Jennifer—began and ended in American Samoa or Guam. Tr. at 23-25. Consistent with the light burden afforded seamen as wards of admiralty, we are satisfied that this general showing for all members of the Crew satisfies the purpose and intent of § 11107's port of engagement provision.

G. Port Wait Time

As discussed briefly above, the Kassandra Z docked at the conclusion of trip number 26 on April 27, 1996, but was not arrested until July 2, more than two months later. During this intervening period, which the Crew identifies as "trip 27," the Crew was indeed active in maintaining the vessel and preparing it for its next fishing voyage. Tr. at 205. In several conversations with "Cousin John" Zuanich, Goran Milisic was told to keep working on the boat, and was assured that money would be available to permit the next trip to go forward as planned. Tr. at 329. He relayed these assurances to the Crew, who rather than seeking alternative employment on other vessels as they likely would otherwise have done, remained on the Kassandra Z in reliance on those promises from KZFC. Tr. at 329.

Gojko Milisic, similarly, testified that he had received regular assurances from KZFC regarding the company's financial situation and the prospects of future fishing:

Q: And what did Cousin John Zuanich tell you about the prospects of your ability to leave port on Trip 27?

A: He asked me if I'm going out on the next trip, I say yes, and he said we got problems financially. We get a loan soon. Once we get the loan final, you guys going to get paid and you're ready to go fishing.

Q: Now the boat came in on April 27, 1996 and she was arrested on July 2, 1996. Between that time period . . . on how many occasions did you have conversations with Cousin John Zuanich about keeping the crew on board and getting ready for leaving port on Trip 27?

A: At least once a week.

Q: And what in essence did Mr. John Zuanich tell you week after week about what you and the crew of Kassandra Z should do while waiting for the financing to come through *for the Z Company?*

A Don't go any place. It's almost done

Tr. at 66-67. The company's pitch to the Crew was also confirmed by a fax of June 4, 1996:

I want to assure everyone on board the vessels that we are very close to finalizing the "deal" with our new invest[ors], we are down the stretch as they say in English. I realize all of you in Samoa as well as those in Guam continue to hear the same old storey [sic] week upon week in regard to further solutions and delays. . . . A family member will be in Samoa shortly to clear all these matters up *and get the vessels out fishing soon,* and payrolls will be brought up to date.

Tr. Ex. 14 (emphasis added). For Gojko Milisic, as presumably for many of the rest of the Crew, these assurances resulted in his refusal to seek other employment—or even to accept other unsolicited job offers—so that he would be available when the Kassandra Z was once again ready to sail. Tr. at 68-70.

■ When a seaman performs work for a vessel in reasonable anticipation of a prospective fishing trip, that seaman is entitled to be compensated for his services on a *quantum meruit* basis. In *Zuguin v. M/V Captain M.J.* Souza, for example, we found that a helicopter mechanic was properly due his regular wage for work performed prior to a fishing trip, even though he voluntarily quit his position due to a wage disagreement. 23 A.S.R.2d 7 (Trial Div. 1992). The Crew's situation in the instant case is even more compelling. These seamen did not walk off the vessel in dissatisfaction; they were *thrown* off. The Crew is entitled to be compensated for remaining available to KZFC and for the actual work performed aboard the Kassandra Z following trip number 26.

Judge Unpingco made a similar finding based on *quantum meruit* in the *Chloe* Z matter. Memorandum Order of June 19, 1998, at 7-13. In its brief, however, TCW contends that the facts of the Kassandra Z are "radically different" from those in Guam. Brief at 38-39. In particular, TCW points to the shorter port time for the Kassandra Z, the Crew's freedom to leave that vessel, and the fact that the fish had already been

unloaded for most of the relevant period.[9] None of these circumstances changes the simple fact that the Crew did perform valuable services for KZFC during the time spent in port. We fail to see why protecting unloaded fish in one case should be compensable, while cleaning and otherwise maintaining a vessel so that she would be ready for immediate departure should not. In the same regard, whether work was performed for a single day or for a hundred—and whether performed under circumstances of confinement or not—the Crew is nevertheless entitled to compensation for its services.[10]

 There remain the issues of both the timing and the appropriate calculations of the *quantum meruit* award. With respect to the first, TCW contends that trip number 26 was not completed until the catch from that trip was actually unloaded and the boat was cleaned on May 21, 1996; the Crew maintains that trip 26 concluded much earlier, that the fish were not promptly unloaded only because the Crew had not been paid its wages due, and that the port wait time award should include the period beginning on April 27, 1996, the date the Kassandra Z returned to port after trip number 26. Whatever the reasons for the delay, the record includes ample evidence to support the common understanding that a fishing trip is only completed when the catch has been off-loaded to the cannery and the vessel has been cleaned. Tr. at 64 (testimony of Fish Captain Gojko Milisic), 213 (testimony of Crewmember Branko Gregov), 195 (testimony of Crewmember Tonci Jusic). We find that the

---

[9] When the Chloe Z came into port, that crew was apparently confined to the vessel for a full 96 days, and the fish were never unloaded prior to the date of arrest.

[10] Moreover, although the facts were indeed slightly different in Guam, Judge Unpingco does make a compelling argument which applies equally to the Kassandra Z:

> A fully manned boat, ready to embark on a voyage, was invaluable to a fishing venture desperately seeking cash flow. The release of these men would mean that Chloe Z Fishing Company, Inc. would have to go to the time, trouble and expense of re-manning the vessel. The crew was primarily from Croatia. It would have taken weeks or months to have the boat manned from this source, and would have cost tens of thousands of dollars. In sum, the Chloe Z Fishing Company, Inc. received tangible benefits including a maintained and serviced vessel . . . and a cash savings that could easily exceed $100,000.00. Furthermore, it received the intangible benefit of greater bargaining power against its many creditors, each desperate to recoup losses, and presumably prepared to place hope that the next fish catch would provide the badly needed cash to make the debtor solvent again.

Memorandum Order, at 12.

proper period for the *quantum meruit* award runs only from May 21, 1996, the date by which the catch had been unloaded and the ship had been cleaned, and thereby the official conclusion of trip' number 26. The port wait period concluded on July 2, "1996, the date of arrest, for a total of 43 days. The precise calculation of this award—based on adjusted tonnages and the Crew's § 11107 statutory wage rates—will be addressed below.

## H. Mortgage Seniority

TCW also contends that any award made under § 11107 or for port wait time must be junior to TCW's lien as ship mortgagee. According to this argument, these awards are akin to a "penalty" and, like punitive damages, may only be assessed against the wrongdoer *in personam,* rather than *in rem* against the vessel; in this case, the party responsible for failing to provide written agreements was KZFC, not TCW, which as ship mortgagee was itself innocent of any violations of law.

 Despite TCW's lack of fault vis-à-vis the Crew, however, we do not agree with the characterization of these awards as punitive. While the statute may very well have a deterrent effect by providing the "highest wages" remedy, its fundamental purpose is not to penalize, but rather to compensate seamen *for their wages* when a company fails to provide its crew with written fishing agreements. The port wait time award is similarly intended to compensate the Crew for wages due for work already performed. Although Judge Unpingco did not award § 11107 wages, he did find in favor of the crewmembers on their *quantum meruit* claim, and similarly found that "[s]eamen's liens for wages take priority over all preferred liens except for expenses of justice while the vessel is *in custodia legis*." *TCW Special Credits v. F/V Chloe Z,* Case No. CV 96-00055, Memorandum Order of June 19, 1998, at 14-15, citing Thomas J. Schoenbaum, *Admiralty & Maritime Law,* § 9-6 (2d ed. 1994). The Crew's award herein, in its entirety, is thus senior to TCW's lien.

## I. Interest

 In this jurisdiction, the decision whether to make an award of prejudgment interest "lies soundly within the court's discretion." *Interocean Ships, Inc. v. Samoa Gases,* 26 A.S.R.2d 28, 43 (Trial Div., 1994), *citing Masters v. Transworld Drilling* Co., 688 F.2d 1013, 1014 (5th Cir. 1982) (citations omitted) and *Orduna S.A. v. Zen-Noh Grain Corp.,* 913 F. 2d 1149, 1157 (5th Cir. 1990). In this case, a significant sum of money has been accruing interest in the court registry for a period of over three years; we find it appropriate that the parties should share in the value of that interest accrual in proportion to the value of their claims. As such, we award prejudgment interest to the Crew equal to the

rate at which interest has accrued on the vessel proceeds in the court registry, as discussed in more detail below.

The parties also disagree over the proper date from which any award of prejudgment interest should be calculated. Although we decline to adopt TCW's characterization of "the Crew's undue delay in bringing stale claims," we do find an element of delay which sufficiently persuades us to exercise our discretion in favor of TCW on this matter. Interest shall run from the date of filing of the complaint-in-intervention. *TCW Special Credits v. F/V Chloe Z,* Case No. CV 96-00055, Memorandum Order of June 19, 1998, at 14.

### J. Attorney's Fees

Finally, the Crew makes a claim for an award of attorney's fees. Attorney's fees have already been denied on at least one occasion in this matter. In our order denying Crewmembers' motion for reconsideration, we noted that this jurisdiction follows the "American Rule," whereby in the absence of statute, contract, or other legal basis to the contrary, each party bears the burden of his or her own attorney's fees. Order of September 4, 1998, at 2; *Samoa v. Gibbons,* 3 A.S.R.2d 121, 123 (Trial Div. 1986); *Samoa Products, Inc. v. Pereira,* 3 A.S.R.2d 45, 46 (Trial Div. 1986); *Fou v. Talofa Video,* 2 A.S.R.3d 152 (Trial Div. 1998). This general rule applies equally to cases in admiralty, as we confirmed in the matter of *Interocean Ships, Inc. v. Samoa Gases:* "The prevailing party in an admiralty case is generally not entitled to an award of attorney's fees, absent statutory authorization." 26 A.S.R.2d 28, 41-42 (Trial Div. 1994), *quoting B.P. North America Trading v. Vessel Panamox Nova,* 784 F.2d 975, 977 (9th Cir. 1986).

An exception to the rule that each party bears its own costs exists when a party is found to have acted in "bad faith, vexatiously, wantonly, or for oppressive reasons." *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258-59 (1975), *quoting F.D. Rich Co., Inc. v. United States for Use of Industrial Lumber Co., Inc.,* 417 U.S. 116, 129 (1974), *citing Vaughan v. Atkinson,* 269 U.S. 527. The Crew's request for attorney's fees is premised largely on TCW's refusal to pay even admittedly due wages until the resolution of this litigation. This court— and certainly the members of the Crew—certainly would have *preferred* TCW to have taken such a course, so that at least the minimum prospective recovery could have been available to these individual seamen over three years ago; however, we find no caselaw or statutory provision mandating such an action, and do not find that it rises to the level of "bad faith" necessary to invoke the narrow exception to the American Rule.

The Crew does cite authority standing for the proposition that attorney's fees may be appropriate when a plaintiff has been compelled to hire an attorney to recover wages clearly owed to him. *Jose v. M/V Fir Grove,* 801 F.Supp. 358, 377 (D. Ore. 1992); *Vaughan v. Atkinson,* 369 U.S. 527 (1962). Far from "forcing" the Crew to sue to recover their back wages, as the Crew contends, we find that TCW did make good faith settlement offers—which included both interest and repatriation, as well as a small premium—based on full agreed wages. While these offers were for less than the total amount actually recovered herein, they were undeniably reasonable, and were apparently accepted by several other plaintiffs with nearly identical claims also arising out of the failure of the Zuanich company. *See* TCW's Trial Brief, filed June 1, 1999, at 2-3; *see also TCW Special Credits v. Chloe Z,* Order of March 6, 1997, at 24-25.[11]

The Crew's request for attorney's fees is denied.

K. Damages Calculations

In accordance with the above rulings, damages shall be assessed as follows:

1. Trips 16-24—"Short checks"

Although there were some legitimate questions raised at trial about their accuracy, the document provided by Mr. Thomas Meneghini, Trial Exhibit No. 52, offers the most concise summary of the amounts owed to the Crew for trips 16-24. Based on the testimony at trial, we do make two adjustments herein, namely adding 203.5 tons for trip 17 and 83.9 tons for trip 18. With respect to these trips, Mr. Meneghini admitted that the figures listed in Exhibit 52 were *likely* inaccurate, and that such adjustments should probably be made in favor of the Crew.[12] Tr. at 405-07. Given these changes, the Crew concedes that Meneghini's figures are

---

[11] Indeed, these settlement offers exceeded those offered by the U.S. Department of Commerce, itself a holder of senior mortgages on six Zuanich boats. TCW's Trial Brief, at 3.

[12] Mr. Meneghini did later hedge on these admissions, stating that he could not be sure of the errors until he had been afforded an opportunity to review the full records. Tr. at 421. In the absence of further evidence, however, we are willing to give the Crew the benefit of the doubt and award them credit for those missing tons accordingly:
Exhibit 52 reflects an overpayment of 82 tons on trip 17. Subtracting this amount from the 203.5 tons still owing, the Crew 'shall be paid on 121.5 tons for that trip.
Exhibit 52 reflects an overpayment of 18 tons for trip 18. Subtracting this amount from the 83.9 tons still owing, the Crew shall be paid on 65.9 tons for that trip.

substantially accurate. Closing Brief at 21. As such, the short check amounts due shall be:

| | |
|---|---|
| Trip 16 — 64 tons | $9,248.00 |
| Trip 17 — 121.5 tons | $14,792.63 |
| Trip 18 — 65.9 tons | $8,286.93 |
| Trip 19 — (10 tons) | ($1,435.00) |
| Trip 20 — 26 tons | $3,887.00 |
| Trip 21 — (63 tons) | ($8,662.50) |
| Trip 22 — 147 tons | $28,229.12 |
| Trips 23 and 24 — paid in full | $0.00 |
| | |
| TOTAL DUE FOR TRIPS 16-24: | $54,346.18 |

2. **Trip 25—Agreed wages at adjusted tonnages for the Fish Captain and Master**

Similarly, because Exhibit 52 reflects agreed wages at adjusted tonnages, for Fish Captain Milisic and Master Raymond—ineligible for § 11107 relief—we base our awards for trip number 25 on that document, as well.[13]

| | |
|---|---|
| Fish Captain Gojko Milisic | $55,479.79 |
| Master Raymond Falante | $19,008.29 |
| TOTAL DUE MASTER AND FISH CAPTAIN FOR TRIP 25: | $74,488.08 |

3. **Trips 25 and 26—§ 11107 statutory wages at adjusted tonnages for the remainder of the Crew**

The Crew contends, and TCW does not appear to dispute, that the highest paid wages per ton by position within the Zuanich fleet were as follows:

| | | |
|---|---|---|
| Fish Captain | $45.00 | (Yolanda Z)[14] |
| Master | $25.00 | (Yolanda Z)[15] |
| Chief Engineer | $29.00 | (Larry Z)[16] |
| Assistant Engineer | $17.00 | (Soleil Z)[17] |
| Helicopter Pilot | $13.00 | (Chloe Z)[18] |

---

[13] Neither Milisic nor Falante sailed on trip number 26, but agreed wages will also serve as the basis for these individuals' recovery in *quantum meruit,* as discussed below.

[14] Exhibit 57, Tr. at 416.

[15] Exhibit 60, Tr. at 419.

[16] Exhibit 58, Tr. at 418.

[17] Exhibit 62, Tr. at 419.

| | | |
|---|---|---|
| Deck Boss | $15.00 | (Kassandra Z)[19] |
| Cook | $10.50 | (Kassandra Z)[20] |
| Seaman/Deckhands | $11.50 | (Larry Z)[21] |

Closing Brief, at 12.

Exhibit 23, Tab 20, represents a summary of calculations prepared by the Crew's economist, Robert Wallace, sets forth several alternative methods of calculating wages. As discussed at length above, we believe that Column 8—"Highest Wage Paid by the Fleet Times the Discounted Weight Per Settlement Sheets"—represents the figure most consistent with the law and the evidence at trial.

That document shows a total of $287,172.60 due to the entire Crew. However, the amounts allocated for that trip to Fish Captain Milisic ($60,912.59) and Master Falante ($32,393.38), already considered above, must be subtracted from that amount, yielding a total award for the rest of the Crew for trip 25 of $193,866.63. *See* Ex. 23, Tab 23.

However, we recognize that neither Gojko Milisic nor Raymond Falante sailed on trip 26. Because we lack sufficient evidence regarding which other individuals aboard that voyage may have been responsible for § 11107 compliance, we find that all Crew members are eligible to statutory wages, for a total award of $154,411.50. Ex. 23, Tab 20.

| | |
|---|---|
| Trip 25 | $193,866.63 |
| Trip 26 | $154,411.50 |
| | |
| TOTAL DUE CREW FOR TRIPS 25 AND 26, EXCLUDING FISH CAPTAIN AND MASTER: | $348,278.13 |

4. Port Wait Time—*Quantum Meruit* Award

The port wait time claim benefits 14 members of the Crew. Fish Captain Gojko Milisic, as with trip 25 above, shall recover only agreed oral wages of $40/ton, while the remaining 13 shall receive the highest rate/ton paid in the Zuanich fleet for their respective positions:[22]

| | | |
|---|---|---|
| Datin, Michael | Chief Engineer | $29.00 |
| Drazic, Dragon | Deck Boss | $15.00 |

---

[18] Exhibit 63, Tr. at 420.
[19] Exhibit 12, Tr. at 62.
[20] Exhibit 3, Tr. at 47.
[21] Exhibit 58, Tr. at 419.
[22] See notes 15-21, *supra*.

| Adams, Thomas | Heli. Pilot | $13.00 |
| Jusic, Tonci | Seaman | $11.50 |
| Natulic, Marjan | Seaman | $11.50 |
| Natulic, Todor | Seaman | $11.50 |
| Strucic, Goran | Seaman | $11.50 |
| Gregov, Branko | Seaman | $11.50 |
| Narcina, Zarko | Seaman | $11.50 |
| Vikario, Ante | Seaman | $11.50 |
| Skific, Miroslav | Seaman | $11.50 |
| Fizulic, Ante | Seaman | $11.50 |
| Skific, Zarko | Cook | $10.50 |

As in the *Chloe Z* matter, we find the appropriate tonnage calculation to be the average daily catch throughout the relevant time period. Memorandum Order of June 19, 1998, at 13. The Crew's economist, Robert Wallace, calculates the average daily catch, per the settlement sheets, to have been 14.417 adjusted tons. Tr. Ex. 24, at 7. To arrive, at final damages, this figure must be multiplied, by the number of days spent in port after the conclusion of the last trip—in this case 43 days—for a total of 619.93 adjusted tons due for payment. Multiplying this total tonnage by each Crewmember's wage/ton, as listed above, yields the following total *quantum meruit* awards:

| Milisic, Gojko | $24,797.20 |
| Datin, Michael | $17,977.97 |
| Drazic, Dragon | $9,298.95 |
| Adams, Thomas | $8,059.09 |
| Jusic, Tonci | $7,129.20 |
| Matulic, Narjan | $7,129.20 |
| Matulic, Todor | $7,129.20 |
| Strucic, Goran | $7,129.20 |
| Gregov, Branko | $7,129.20 |
| Marcina, Zarko | $7,129.20 |
| Vikario, Ante | $7,129.20 |
| Skific, Niroslav | $7,129.20 |
| Fizulic, 'Ante | $7,129.20 |
| Skific, Zarko | $6,509.27 |

TOTAL DUE CREW FOR PORT
WAIT TIME $130,805.28

5. Repatriation

Thirteen members of the Crew are also entitled to compensation for repatriation expenses. At trial, Thomas Meneghini testified to the company's repatriation policies, and, the parties appear to have stipulated to the amount of $1,500.00 due each eligible member of the

Crew. Tr. at 424-26, TCW's Trial Brief at 15. Although there was some dispute regarding the number of Crewmembers eligible for this award,[23] in closing argument TCW did not contest the Crew's assertion that thirteen seamen are so owed, nor was any evidence presented at trial which would indicate prior payment of repatriation expenses. Tr. at 424.

TOTAL REPATRIATION AWARD: $19,500.00

6. Other miscellaneous damages

Also apparently uncontested are amounts owed Goran Milisic for medical bills incurred due to KZFC's failure to pay insurance premiums ($5,827.48) and for rental car expenses ($800.00). Mr. Milisic testified that payment of insurance costs was promised to him as part of his compensation; the rental car was used primarily for company-related purposes, and was routinely provided by the company while in port. Tr. at 321, 326. We find that these amounts are properly owed to Mr. Milisic.

In addition, Mr. Milisic claims that $3,000 was improperly deducted from his wages for a cash advance following trip 26. At trial, Mr. Milisic testified that he only received $1,500, and that this money was not kept by him personally, but rather was disbursed among the Crew. Tr. at 326. On this sparse record, we find that we lack sufficient evidence to award Mr. Milisic reimbursement for this deduction. By a preponderance of the evidence we find that a cash advance was likely paid; if such monies were distributed by Mr. Milisic to other members of the Crew, then his claim should properly be directed towards his fellow shipmates rather than KZFC.[24]

Finally, at trial Mr. Neneghini conceded that Raymond Falante was owed the fish captain's wage for 180 tons caught while he served in that capacity during a portion of trip number 23. Tr. at 150, 424-25. We agree. However, as with Goran Milisic's cash advance claim, the record does not support a finding that this money is owed by *the company*. In fact, Exhibit 53 appears to indicate that full payment for these tons was made to Fish Captain Gojko Milisic, and that Falante's remedy should be collection from Milisic: "As per the telephone conversation I had with [the payroll accountant], Raymond [Falante] would have to contact Gojko [Milisic] to get his share of the fish that he caught as captain."

---

[23] TCW stipulates to payment only for those Crewmembers who actually returned home following trip number 26 and who have not already been paid. Tr. at 426.

[24] In distributing the total monies received as a result of this order, the Crew is also free to compensate Mr. Milisic for this amount as it may deem appropriate.

Page two of that exhibit similarly includes a handwritten note, which Mr. Neneghini identified as having been written by Lawrence Zuanich, indicating that he still had to "put 180 tons *from Gojco [sic] to you.*" *Id.*, Tr. at 399. Although we agree that Mr. Falante should be compensated at a rate of $40/ton, it remains unclear to the court what money, if any, has already been paid to him or to Gojko Milisic for these 180 tons. As such, we decline to make an award for Mr. Falante on this claim.

| | |
|---|---|
| Medical Expenses | $5,827.48 |
| Rental Car | $800.00 |
| TOTAL MISCELLANEOUS DAMAGES: | $6,627.48 |

## 7. Pre-Interest Total

The base amount owed to the Crew, prior to adding interest due, is as follows:

| | |
|---|---|
| Short Checks (Trips 16—24) | $54,346.18 |
| Trips 25 and 26 (Fish Captain/Master) | $74,488.08 |
| Trips 25 and 26 (Remainder of Crew) | $348,278.13 |
| Port Walt Time | $130,805.28 |
| Repatriation | $19,500.00 |
| Miscellaneous damages | $6,627.48 |
| TOTAL AMOUNT OWED TO THE CREW PRE-INTEREST: | $634,045.15 |

## 8. Interest

The amount originally deposited with the court registry as the vessel's sale, less appropriate *custodia legis* fees and other expenses, was $5,860,185.59. The proceeds' on deposit with the registry of the court as of October 18, 1999, is $6,595,749.24, yielding therefore interest in the amount of $735,563.65. Rather than attempting to calculate and compound a monthly rate of interest, we simply find that the Crew was owed $634,045.15 out of the original deposit of $5,860,185.59, and are therefore entitled to 10.82% of interest accrued thereon as of the date of, this order. The Crew's 10.82% of interest equals $79,587.99, bringing their total award to approximately $713,633.14. Less the Marshal's

Auction Fee of $90,015.00 payable to the American Samoa Government, the total amount therefore remaining on deposit with the registry of the court as of date hereof is $5,792,101.10

## Order

For the foregoing reasons, the Crew shall have judgment in the sum of $713,633.14, payable from the funds on deposit with the registry of the court. The sum of $90,015.00, being auction fees, shall also be paid to the American Samoa Government from the funds on deposit with the registry of court. The balance of $5,792,101.10 shall remain in the court's registry for further disposition.

It is so ordered.